**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOSEPH MICHAEL GUARASCIO**, | |
| Plaintiff, | |
| v. | Case No. 18-cv-2791 (CRC) |
| **FEDERAL BUREAU OF INVESTIGATION**, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Federal inmate Joseph Michael Guarascio filed this *pro se* action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. The suit challenges the Federal Bureau of Investigation's ("FBI's" or "Bureau's") responses to his 2016 and 2018 requests seeking files related to his 2009 conviction for manufacturing child pornography. After the FBI twice maintained that it could not process his requests because he had waived his FOIA and Privacy Act rights in his plea agreement, Guarascio filed a complaint in this Court. That filing spurred the FBI to start processing his requests. Now that production is complete, the FBI moves for summary judgment. For the reasons below, the Court will grant its motion in part.

### I. Background

In 2009, Joseph Michael Guarascio pleaded guilty and was convicted of manufacturing child pornography. Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 1. As part of his plea agreement, Guarascio agreed to waive "all rights . . . to request or receive from the United States any records pertaining to the investigation . . . of this matter," including all "rights conferred under the Freedom of Information Act and the Privacy Act of 1974." Compl., Ex. 2 at

3.  Nonetheless, in 2011, the Bureau neglected to enforce this waiver due to an "administrative oversight" when it processed 2,010 pages and released 254 pages regarding Guarascio's criminal case at the request of his attorney.  DSUMF ¶ 2; Declaration of Michael G. Seidel ("Seidel Decl.") ¶¶ 6 n.1, 27.

Guarascio was not so fortunate when he submitted his own FOIA and Privacy Act request in 2016, seeking all "[d]ocuments (whenever generated), property vouchers of seized property or evidence, any documentation provided or turned over to your agency by other law enforcement agencies, [and] transcripts of (audio, video) interviews pertaining to [his] prosecution."  Compl., Ex. 2, at 10.  Guarascio additionally sought "[a]ny documents regarding [his] name," providing his full name, date and place of birth, and his social security number.  Id.  He then averred that he was willing to pay reasonable search and production costs.  Id.  The FBI refused this offer, however, informing Guarascio that it could not process his requests because he had waived his FOIA and Privacy Act rights under his plea agreement.  DSUMF ¶ 7.  After unsuccessfully appealing that determination within the FBI, Guarascio filed another request seeking the same information two years later.  Id. ¶ 10.  Once again, the FBI declined to process his request in light of his plea agreement.  Id. ¶ 11.

After this second refusal, Guarascio filed the present action in this Court.  His complaint alleged that the waiver in his plea agreement was unenforceable under the D.C. Circuit's then-recent decision in Price v. Department of Justice, 865 F.3d 676 (D.C. Cir. 2017), and requested a declaratory judgment to that effect.  See Compl. at 7–8.  Guarascio also sought an injunction directing the Bureau to provide him with the requested information.  Id. at 8.  In describing the materials sought, Guarascio quoted from the first half of his FOIA request for all documents

regarding his criminal case but did not mention his additional demand for documents referencing his name.  See id. at 4–5.

That lawsuit got the FBI's attention and jumpstarted production.  The Bureau began by sending Guarascio a letter, enclosing the 254 pages concerning his criminal case that the FBI previously released to his then-attorney in 2011.  DSUMF ¶¶ 12–13; Declaration of David M. Hardy ("Hardy Decl."), ECF No. 20-1 ¶ 14.  Still unsatisfied, Guarascio challenged the extent of the production.  DSUMF ¶ 13.  The FBI responded by re-processing the previously produced 2011 records, assigning coded exemption categories, and comparing these records with Guarascio's investigative file to look for any additional records.  See Seidel Decl. ¶¶ 6 n.1, 13. The FBI then ran a new search within its Central Records System ("CRS"), which it describes as "an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI" that "spans the entire FBI organization."  Id. ¶ 14.  In particular, the FBI searched the automated indices available through its "Sentinel" case management system, which replaced the Automated Case Support ("ACS") system and contains all data previously housed in ACS.  See id. ¶¶ 20–21, 26.  Consistent with standard practice, the FBI searched "Joseph Guarascio" to find Plaintiff's "main" file.  Id. ¶¶ 24, 26.  Then, to comply fully with his inquiries, the Bureau "conducted an additional search of the CRS to locate any 'reference' material potentially responsive to Plaintiff's request."  Id. ¶ 24.

After conducting these searches, the FBI released responsive documents to Guarascio bit by bit over the span of more than one year.  See id. ¶¶ 6–11.  In all, the FBI identified 2,089 responsive pages of records, released 159 pages in full, released 141 pages with redactions, and withheld 1,789 pages in their entirety.  Id. ¶ 62.  With each release, the FBI explained that "although these responsive records were exempt from disclosure in their entirety pursuant to

Privacy Act Exemption (j)(2), the records were reviewed and processed under provisions of the FOIA to afford the greatest degree of access authorized by both laws."  Mot. for Summ. J. ("MSJ") at 4.  Thus, the FBI claimed that it withheld in whole or in part only those records falling under FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E).  Seidel Decl. ¶ 4.

      Alongside the production of these documents, the parties also squabbled over a handful of digital records.  Following its initial search, the FBI sent Guarascio a letter in December 2019 informing him that the Bureau had "located 35 pages of records, consisting of photographs, as well as numerous audio files."  DSUMF ¶ 14.  The letter advised Guarascio that the price for producing the digital media would be $700 to account for the costs of CDs to store the digital files and that he was required to pay half that amount up front.  Id. ¶ 15; see also Hardy Decl., Ex. J at 1 (explaining the Bureau needed 47 CDs, each costing $15, for the production).  Guarascio never made the down payment, however, despite two separate reminders from the FBI that he was required to do so to obtain the audio files.  See Errata to Joint Status Report, ECF No. 29 at 1.  Guarascio instead wrote to the FBI that he was "in the process of addressing the cost of the CDs with the Court[,] as [he] believe[d] that the cost for obtaining these CDs and other information should be waived as [he] had to incur significant Court and other legal fees involved with [his] Civil filing."  Hardy Decl., Ex. K at 1.  Shortly thereafter, Guarascio filed a status report with the Court asserting that the costs should either be waived, reimbursed, or reduced because he "has incurred significant Court costs" in this litigation and believes that the requested records "contain exculpatory evidence relevant to his case."  ECF No. 16 at 2.  The Court responded by issuing a minute order that "encourag[ed] the Government to consider Plaintiff's request for a fee waiver for the production of digital media (or production by alternative means)" but took "no position" on the matter.  The FBI did not budge from its

demand for full payment, however.  In its January 2021 status report, the FBI informed the Court

it had finished reviewing the fee waiver request and determined "that a fee waiver is not

warranted for various reasons."  ECF No. 32 at 1.  The FBI explained Guarascio was not entitled

to a price cut for producing these materials because he did not seek a fee waiver in his original

request, he had received more than the 100 free pages to which he was entitled under FOIA, and

there was no public interest in waiving the fee as disclosure would benefit only Guarascio.

Because Guarascio never tendered payment, the Bureau never produced these digital records.

       With production now complete, the FBI moves for summary judgment.  The motion

contends that (1) Guarascio lacks standing to challenge the FOIA/Privacy Act waiver in his plea

agreement now that the FBI has produced the requested records; (2) the Bureau performed an

adequate search; (3) it was not required to produce the digital files because Guarascio failed to

make the required payment; (4) all withholdings of the paper records are justified under FOIA's

statutory exemptions; and (5) it reasonably segregated and released all non-exempt records.  In

support of its motion, the FBI submitted a declaration from Michael Seidel, the Chief of its

Record/Information Dissemination Section ("RIDS"), as well as a Vaughn index.  See Seidel

Decl.; id., Ex. G ("Vaughn Index").  Guarascio filed an opposition, disagreeing on all counts.

## II.  Legal Standard

       Summary judgment may be granted when the moving party establishes that there is no

genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a).  Summary judgment is the typical mechanism to determine whether an agency has met

its FOIA obligations.  See, e.g., Judicial Watch, Inc. v. CFPB, 60 F. Supp. 3d 1, 6 (D.D.C. 2014).

       To prevail on summary judgment in a FOIA matter, the agency must first show that it

conducted an adequate search for the requested records.  "For a search to be adequate, an agency

must show 'beyond material doubt that its search was reasonably calculated to uncover all relevant documents.'"  Bagwell v. U.S. Dep't of Just., 311 F. Supp. 3d 223, 228 (D.D.C. 2018) (quoting Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011)).  That is, the issue is "whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  "Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."  Id.  To show its search was reasonable, an agency may rely on official affidavits detailing "what records were searched, by whom, and through what process."  Steinberg v. U.S. Dep't of Just., 23 F.3d 548, 552 (D.C. Cir. 1994).  Such affidavits are "accorded a presumption of good faith."  SafeCard Servs., 926 F.2d at 1200.

An agency then must justify any withholdings it makes under FOIA's nine statutory exemptions.  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002).  An agency can satisfy its burden of proving that an exemption applies by submitting sufficiently detailed affidavits, which are also "accorded a presumption of good faith."  SafeCard Servs., 926 F.2d at 1200.  But given that FOIA's primary purpose is disclosure, courts construe these exemptions narrowly.  See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

FOIA also requires "[a]ny reasonably segregable portion of a record [to] be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  Agencies must explain why non-exempt material is not reasonably segregable.  Id. at 261.  "Nevertheless, '[a]gencies are entitled to a presumption that

they complied with the obligation to disclose reasonably segregable material,' which must be overcome by some 'quantum of evidence' by the requester."  Henderson v. ODNI, 151 F. Supp. 3d 170, 179 (D.D.C. 2016) (quoting Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007)).

## III.   Analysis

Taking the FBI's arguments in turn, the Court first concludes that the FBI has not shown that Guarascio lacks standing to challenge his FOIA/Privacy Act waiver because the Bureau's release of the requested records mooted his claim.  The Court next finds that the FBI failed to carry its burden as to the adequacy of its search because it did not aver that it searched all files that are likely to contain responsive materials.  But the FBI scores better when it comes to its withholdings, as the Court agrees that it was not required to waive the fee for the digital records and that the lion's share of the withholdings fall within one of FOIA's statutory exemptions— with the limited exception that the FBI has not shown that all withholdings under Exemption 7(D) were provided in confidence.  Finally, the Court finds that the FBI reasonably segregated and released all non-exempt records.  The Court will, accordingly, grant the FBI's motion in part and direct the Bureau to file a supplemental declaration on the remaining matters.

### A.   FOIA & Privacy Act Waiver

Before addressing the particular FOIA disputes at issue, the Court first must resolve the FBI's claim that Guarascio lacks standing to challenge the FOIA/Privacy Act waiver found in his plea agreement.  Although the FBI initially invoked this waiver when refusing to process Guarascio's requests, the Bureau contends that it is no longer denying access to any requested records on this basis and therefore Guarascio lacks an informational injury needed to challenge the waiver's enforceability.  See MSJ at 3–4.  The FBI is correct in its premise, but mistaken in

its conclusion.  Contrary to Guarascio's suppositions, the FBI is not relying on the plea agreement in any manner here.  But that does not necessarily mean that he lacks standing to pursue a declaratory judgment regarding the enforceability of his waiver.  Rather, it is the FBI's burden to demonstrate that its voluntary cessation of the challenged action has mooted Guarascio's claim.  The FBI does not even discuss mootness in its briefs, however, let alone satisfy its heavy burden on this issue.

For starters, much of Guarascio's opposition (as well as his initial complaint) is aimed at the FBI's invocation of his plea agreement to refuse processing his requests.  See Opp'n at 2–3, 5, 7–10, 11.  For instance, Guarascio complains the FBI has processed his requests only as "'a courtesy' and not in compliance with any FOIA requirements."  Id. at 2.  Guarascio additionally insinuates that this "courtesy" may be bogus, hazarding that the FBI may not have conducted an actual search given that the "bulk of the documents released by the Agency were copies of his 'Inmate Mail' and some other documents provided to them by the State Agencies," id. at 6, and that the FBI did not "release documents relevant to any discovery, i.e., Lab and Forensic Reports of his electronic devices and other documents" which he believes it possesses, id. at 7; see also Supp. Opp'n at 2 ("It can only be deduced the Defendants realized the fraudulent nature of the [plea agreement], and their action to simply disclose non-relevant documents is an attempt [to] obfuscate from the miscarriage of justice.").

This argument is a non-starter.  Although the FBI at first refused to process Guarascio's 2016 and 2018 FOIA requests based on the waiver, Mr. Seidel's declaration lays out the various searches that the FBI later performed to process those requests and asserts the FBI is now only withholding records that (it believes) fall within a statutory exemption.  See Seidel Decl. ¶¶ 13, 26–27.  This declaration carries a presumption of good faith, see SafeCard Servs., 926 F.2d at

1200, and cannot be defeated with far-fetched theories like those Guarascio advances.  To the

extent Guarascio's grudge boils down to a complaint that the FBI failed to hand over documents

that he believes it should possess, this speculative allegation speaks to the scope of the search

and subsequent production.  The relevant fact here is that the FBI submitted a declaration stating

that it is no longer relying on the plea agreement's waiver in any way, and Guarascio has

presented no concrete evidence suggesting otherwise.

      With that said, the FBI errs in contending that its disavowal of the waiver defeats

Guarascio's standing to seek a declaratory judgment on the waiver's enforceability.  Whether a

plaintiff has standing to sue is "determined as of the time the complaint is filed." Cleveland

Branch, NAACP v. City of Parma, 263 F.3d 513, 524 (6th Cir. 2001).  There is no question that

Guarascio had standing to challenge the waiver's enforceability when he filed his complaint

given that, at that time, the FBI was refusing to process his FOIA and Privacy Act requests on

that basis.  Properly construed, then, the FBI's argument here is not that Guarascio lacks standing

to pursue his claim but rather that this once-live controversy is now moot.  See Leonard v. U.S.

Dep't of Def., 38 F. Supp. 3d 99, 104 (D.D.C. 2014) (noting that, even if a case is live at the time

it is filed, "[a]n intervening event may render a claim moot").  This might at first blush appear to

be a distinction without a difference considering that the Supreme Court often has referred to

mootness as "the doctrine of standing set in a time frame."  See, e.g., U.S. Parole Comm'n v.

Geraghty, 445 U.S. 388, 397 (1980) (citation omitted).  But the Supreme Court has clarified that

"this description of mootness is not comprehensive" because it fails to account for the

exemptions to mootness—for example, the voluntary cessation exception under which "a

defendant claiming that its voluntary compliance moots a case bears a formidable burden."

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 170 (2000).

9

This distinction makes a big difference here because it flips the burden.  "Unlike some jurisdictional questions such as standing or ripeness, the party asserting mootness . . . bears the initial heavy burden of establishing that the case is moot."  Atlas Brew Works, LLC v. Barr, 391 F. Supp. 3d 6, 11 (D.D.C. 2019) (citation and quotation marks omitted).  That heavy burden carries over to cases where, as here, the intervening event is the defendant's voluntary cessation of the challenged conduct.  See Payne Enters., Inc. v. United States, 837 F.2d 486, 491–92 (D.C. Cir. 1988).  In such cases, defendants must prove that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation."  Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) (citation and quotation marks omitted).  The FBI has not even attempted to satisfy its heavy burden here, and there is significant reason to question whether there is "no reasonable expectation that the alleged violation will recur."  After all, the FBI initially produced the records due to a self-described "administrative oversight," released additional documents only as a "courtesy" even after the D.C. Circuit called these types of waivers into question in Price, and failed to disclaim any future reliance on the waiver during this litigation even though it has had ample opportunity to do so.  In this context, the Court cannot find that there is no reasonable expectation of recurrence without further briefing on the matter.

Accordingly, the Court cannot grant summary judgment on this issue at this time.  The Bureau is free to raise its jurisdictional challenge to this claim anew by addressing the mootness concerns outlined above.  The Bureau also may, if it so chooses, address the merits of whether the waiver at issue here is valid in light of Price and ensuing caselaw.  See, e.g., Barnes v. FBI,

35 F.4th 828 (D.C. Cir. 2022); <u>Taylor v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys</u>, No. 20-cv-927 (JMC), 2023 WL 2734082 (D.D.C. Mar. 31, 2023).

    B.  <u>Adequacy of the Search</u>

Turning to the substance of the FOIA dispute, the parties begin by debating whether the FBI conducted an adequate search for responsive records.  At summary judgment, an agency can meet its burden on adequacy by submitting a detailed affidavit (1) "setting forth the search terms and the type of search performed" and (2) "averring that all files likely to contain responsive materials . . . were searched."  <u>Iturralde v. Comptroller of Currency</u>, 315 F.3d 311, 313–14 (D.C. Cir. 2003) (citation omitted).  The FBI satisfies only the first part of this two-pronged requirement.  Thus, while it is possible that the FBI was diligent in its search, the Court cannot award it summary judgment at this juncture.

Guarascio's arguments concerning the adequacy of the search mostly miss the mark.  He spills most of his ink wagering that the FBI may not have conducted a new search in response to his requests and speculating that the FBI has additional documents in its possession that it failed to turn up.  In particular, he maintains that the FBI's search should have uncovered "Electronic files, Digital Data and other Digital Property" that "was taken" from him and which he believes "is currently being held by" the Bureau.  Opp'n at 12.  To support this supposition, Guarascio points to photographs from his criminal case depicting his computer devices, which he believes the FBI seized from his residence during its investigation.  <u>Id.</u>  He also maintains the FBI should have in its possession "Agency 302s," a form used to report or summarize FBI agent interviews, and that no such forms were produced.  <u>Id.</u> at 11.  But the problem with this line of argument is

that the "adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde, 315 F.3d at 315.[1]

Regarding the methods used here, Guarascio suggests that the FBI searched only "main" files in response to his FOIA request—that is, the files created for a particular individual who is subject to or the focus of an investigation—as opposed to "reference" files created for all those associated with an investigation. Opp'n at 11; see also Seidel Decl. ¶ 16 (describing "main" and "reference" files). But this assertion is flatly contradicted by Mr. Seidel's declaration that, after searching Guarascio's main file, the Bureau "conducted an additional search of the CRS to locate any 'reference' material potentially responsive to Plaintiff's Request." Seidel Decl. ¶ 24. Once again, this declaration is entitled to a presumption of good faith. See SafeCard Servs., 926 F.2d at 1200.

But this presumption applies only to what agency officials said in their declarations, and the issue here is what Mr. Seidel did *not* say—namely, he did not "aver[] that all files likely to contain responsive materials . . . were searched." Iturralde, 315 F.3d at 313–14. Mr. Seidel's declaration details the FBI's "search terms and the type of search performed," id. at 314, and provides some general assurances about the sufficiency of the scope. For instance, the

_____

[1] That is not to say that the fruits of a search are irrelevant to the inquiry. While "purely speculative claims about the existence and discoverability of other documents" are insufficient to rebut a reasonably detailed affidavit on summary judgment, SafeCard Servs., 926 F.2d at 1200 (citation omitted), summary judgment is inappropriate where "a review of the record raises substantial doubt, particularly in view of well-defined requests and positive indications of overlooked materials," Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999) (citation and quotation marks omitted). Here, the Court has some concerns over the absence of any FD-302 forms given that it is standard practice for agents to complete these forms after interviews and it appears from the FBI's motion that it conducted multiple interviews related to Guarascio's case. See MSJ at 18. However, the Court will reserve judgment on this matter until the Bureau has satisfied its threshold requirement of averring that it searched all areas in which materials were likely to be found.

declaration states that the search was "reasonably calculated to locate records responsive to" the requests because, "given its comprehensive nature and scope, the CRS is the principal records system searched by RIDS, to locate information responsive to most [FOIA] requests, because the CRS is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval."  Seidel Decl. ¶ 27.  Further, Mr. Seidel stated that the requested information "would reasonably be expected to be located in the CRS via the index search methodology" because Guarascio's attorney previously requested and received the same type of information Guarascio requests now.  Id.

Close, but no cigar.  While it may in fact be the case, Mr. Seidel stopped short of attesting that CRS likely contains *all* responsive records or that the queries run within that system were exhaustive.  The Court cannot overlook this oversight, as courts in this District routinely find that "[s]ummary judgment is inappropriate where the defendant's declarations sufficiently identify the search terms used and the locations searched but do not provide the requisite averment that all locations likely to contain responsive records were searched."  Sarras v. U.S. Dep't of Just., No. 19-cv-0861 (CRC), 2021 WL 9909763, at *5 (D.D.C. Aug. 5, 2021) (cleaned up) (quoting Heffernan v. Azar, 317 F. Supp. 3d 94, 113 (D.D.C. 2017)); see also Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (requiring an agency to "aver[] that all files likely to contain responsive materials (if such records exist) were searched").  The Court therefore must decline to grant the FBI's motion for summary judgment on this issue.  It directs the FBI to cure this deficiency in the record and will reserve judgment until it receives this supplemental declaration and Guarascio's response.

To be clear, the Court does not hold that the FBI is required to search additional records systems to adequately respond to Guarascio's requests.  "There is no requirement that an agency

search every record system." Oglesby, 920 F.2d at 68.  An agency "need not knock down every search design advanced by every requester," DiBacco, 795 F.3d at 191, nor "speculate about potential leads," Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996).  The Court finds only that the FBI is not entitled to summary judgment where its affiant fails to aver that it searched all locations likely to contain responsive records.  Should the FBI cure this deficiency with a new affidavit, the burden will shift to Guarascio to rebut that affidavit with countervailing evidence—i.e., more than "mere speculation" as to yet uncovered documents.  Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004).

        C.  Fee Waiver for Digital Records

        Beyond challenging the adequacy of the search, Guarascio also claims the FBI wrongly refused to hand over materials that it did uncover.  One category of these materials is the digital records that the FBI held back because Guarascio failed to pay the $700 processing costs.  Although neither party delves far into this issue in their briefings, the Court concludes that the FBI was not obligated to waive the costs of production based on the record before it and thus that it is not required to turn over these records until Guarascio pays his tab.[2]

        A FOIA requester generally "must pay reasonable costs for the search, review, and duplication of the records sought."  Espinoza v. Dep't of Just., 20 F. Supp. 3d 232, 242 (D.D.C. 2014) (quoting Schoenman v. FBI, 604 F. Supp. 2d 174, 188 (D.D.C. 2009)).  Yet there is an exemption to this general rule:  An agency must waive such fees "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of

---

        [2]  Because it is not determinative to the outcome here, the Court will assume Guarascio has exhausted his administrative remedies with respect to the FBI's denial of his fee waiver, in large part because the FBI apparently did not provide him with notice of his right to an appeal when denying his request for a fee waiver in its January 2021 status report.  See Oglesby, 920 F.2d at 67; Espinoza v. Dep't of Just., 20 F. Supp. 3d 232, 241 (D.D.C. 2014).

the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  In seeking a fee waiver, the FOIA requester "bears the initial burden of proving that the foregoing requirements exist," Espinoza, 20 F. Supp. 3d at 242, and "conclusory statements that the disclosure of the requested documents will serve the public interest are not sufficient," Judicial Watch, Inc. v. Dep't of Just., 185 F. Supp. 2d 54, 60 (D.D.C. 2002).

Reading his filings liberally, Guarascio appears to maintain he is entitled to a fee waiver because he is indigent and because the requested digital records are relevant to his allegations of ineffective assistance of counsel, prosecutorial misconduct, and other vague improprieties in his underlying criminal case.  Opp'n at 8–9.  In making these assertions, however, Guarascio did not demonstrate that he satisfied all requirements for a fee waiver.  In particular, his request for a fee waiver is doubly doomed because he failed to show that disclosure of these digital records would advance the public interest or describe how he plans to disseminate the information.

Most critically, from his statements before the Court and to the agency, it is doubtful that the requested records would serve any public interest.  These digital records are aimed at proving Guarascio's innocence, and courts regularly reject fee-waiver requests from inmates seeking records about their criminal cases and contending that a waiver serves the public interest "in setting free an innocent man."  Espinoza, 20 F. Supp. 3d at 242 (citation omitted).  These cases "establish that where the requester seeks information concerning himself only," denial of a fee waiver request "will be upheld."  Id. at 243 (quoting Ely v. Postal Serv., 753 F.2d 163, 165 (D.C. Cir. 1985)); see id. (citing other cases holding that information sought for challenges to convictions does not contribute to public understanding); Ortloff v. Dep't of Just, No. 02-cv-5170, 2002 WL 31777630, at *1 (D.C. Cir. Dec. 11, 2002) (same).  And while unveiling

systemic prosecutorial misconduct undoubtedly serves the public interest, see Bartko v. United States Dep't of Just., 898 F.3d 51, 75–76 (D.C. Cir. 2018), Guarascio did not demonstrate how the requested records here would serve an interest other than his own.  In fact, he does not even support his assertions that these records would advance his own cause because he furnishes no evidence to support his claims of misconduct in his criminal case.  The law is clear, however, that "[r]equests based on nothing more than bare allegations of malfeasance, unsupported by the evidence, do not have enough informative value to merit a fee waiver." Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just., 602 F. Supp. 2d 121, 128 (D.D.C. 2009) (citation and quotation marks omitted).

Moreover, in "assessing whether a public interest fee waiver request should be granted, the Court must consider the requester's ability and intention to effectively convey or disseminate the requested information to the public." Prison Legal News v. Lappin, 436 F. Supp. 2d 17, 26 (D.D.C. 2006) (quotation marks omitted).  Guarascio provided no indication that he plans to disseminate the requested information to the public.  That omission "alone [provides] a sufficient basis for denying the fee waiver request." Espinoza, 20 F. Supp. 3d at 243 (cleaned up).

In sum, the Court concludes that Guarascio failed to satisfy his burden when requesting a fee waiver for production of the digital records.  The FBI therefore did not act unlawfully when refusing to release these materials gratis.

D.  Withholdings and Exemptions

Guarascio next challenges the Bureau's various withholdings under statutory exemptions to FOIA and the Privacy Act—namely, Exemption (j)(2) of the Privacy Act and Exemptions 3, 6, 7(C), 7(D), and 7(E) under FOIA.  The Court concludes that the FBI sufficiently justified each

category of withholdings, with the exception that it has not yet demonstrated that all materials withheld under Exemption 7(D) are truly confidential and thereby shielded from disclosure.

### 1.   Privacy Act Exemption

Before moving to the FOIA exemptions, it is necessary to pause at the Privacy Act.  The Privacy Act entitles individuals to access records maintained in federal government files about them.  See 5 U.S.C. § 552a(d).  But as with FOIA, there are exemptions to this right.  One statutory exemption that is particularly relevant here is 5 U.S.C. § 552a(j)(2), which "protects documents that are maintained by law-enforcement agencies for criminal investigations and that contain personal identifying information."  Cavezza v. Dep't of Just., 113 F. Supp. 3d 271, 275 (D.D.C. 2015).  The FBI contends that all requested documents from the Bureau's CRS fall under Exemption (j)(2) and, as a result, that Guarascio has no right to access those records under the Privacy Act.  See MSJ at 10–11.

This invocation of Exemption (j)(2) appears appropriate.  "Exemption (j)(2) applies, in relevant part, to records that are: (1) stored in a system of records that has been designated by an agency to be exempt from the Privacy Act's disclosure requirements; and (2) stored in a system that is 'maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws,' and that consists of 'information compiled for the purpose of a criminal investigation.'"  Barouch v. U.S. Dep't of Just., 87 F. Supp. 3d 10, 31 (D.D.C. 2015) (quoting 5 U.S.C. § 552a(j)(2)(A)).  Both of those conditions are satisfied in this case:  The FBI has exempted law enforcement investigation records maintained in the CRS from the Privacy Act's disclosure requirements, see 63 Fed. Reg. 8,659, 8,671, 8,684 (1998), and the requested records were all compiled and maintained in fulfillment of the FBI's law enforcement duties, see Seidel Decl. ¶ 29.

The FBI nonetheless chose to process all "records under the access provisions of the FOIA to achieve maximum disclosure." Id. Whether these withholdings are appropriate thus turns on the asserted FOIA exemptions. See Spurling v. U.S. Dep't of Just., 425 F. Supp. 3d 1, 13 (D.D.C. 2019) (finding that, "[e]ven if the FBI could have withheld all of the responsive records under a Privacy Act exemption," the court must assess whether the assertions of FOIA's exemptions are justified because the FBI "also processed the plaintiff's request for documents under the FOIA").

### 2. *Exemption 3*

The Bureau first invokes FOIA Exemption 3, which allows the government to withhold documents "specifically exempted from disclosure by [another] statute," if the exempting statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). The FBI maintains that the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509, prohibits it from disclosing the names, images, and identifying information of Guarascio's victims who were minors at the time of the investigation. See MSJ at 12; Seidel Decl. ¶¶ 35, 47. This should be beyond debate. The "Child Victims' Act unambiguously qualifies as an Exemption 3 statute," Corley v. Dep't of Just., 998 F.3d 981, 985 (D.C. Cir. 2021), and the withheld records fall squarely within the Act's ambit, see 18 U.S.C. § 3509(a)(2). And yet, Guarascio feels the need to note he already knows his victims' identities. If Guarascio intends to suggest that his knowledge of his own predations negates these children's privacy rights, his argument is as astonishing as it is legally irrelevant. And to the extent that Guarascio maintains that Exemption 3 cannot justify wholesale withholdings of full documents, see Opp'n at 13, he misunderstands the nature of the FBI's redactions here. The FBI withheld full documents under Exemption 7(D), not Exemption 3, and the Court addresses these more

sweeping withholdings later on.  For now, it finds the FBI is entitled to summary judgment on its limited Exemption 3 redactions.

### 3. *Exemptions 6 and 7(C)*

The Bureau next turns to Exemptions 6 and 7(C) to justify redacting the names and identifying information of various individuals.  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "The catchall provision 'similar files' includes any government records on an individual which can be identified as applying to that individual." Prechtel v. FCC, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (cleaned up).  Such information is covered by Exemption 6 so long as the "privacy interest in non-disclosure" is greater than "the public interest in the release of the records." Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999) (citation omitted).  Exemption 7(C) likewise protects any information "compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  As with Exemption 6, "the court must balance the privacy interests involved against the public interest in disclosure." SafeCard Servs., 926 F.2d at 1205.  When an agency invokes both Exemptions 6 and 7(C), courts typically "focus" on the latter because Exemption 7(C) "establishes a lower bar for withholding material." Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) (citation omitted); see also U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press, 489 U.S. 749, 756 (1989) (noting while "Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion").

The redacted information fits snugly within these exemptions.  After balancing privacy interests against the public interest in disclosure, the FBI decided to withhold the names and identifying information of third-party victims, informants, individuals mentioned in the FBI's investigative records, and various government employees—including FBI Special Agents, Task Force Officers, and professional staff as well as local law enforcement officers and non-FBI federal personnel.  MSJ at 15–19.  For each group, the court agrees that the balance tilts strongly against disclosure.  On the privacy side of the scale, third-party victims and informants have a strong interest in their names and contact information.  See, e.g., SafeCard Servs., 926 F.2d at 1205; Hodge v. FBI, 703 F.3d 575, 580–81 (D.C. Cir. 2013).  The same goes for the government personnel.  See, e.g., Banks v. Dep't of Just., 538 F. Supp. 2d 228, 240 (D.D.C. 2008) ("Redaction of the names of law enforcement personnel under similar circumstances routinely is upheld.").  And contrary to Guarascio's suggestions, see Opp'n at 13, these privacy interests do not diminish with the passage of time since the investigation wrapped up, see King v. U.S. Dep't of Just., 772 F. Supp. 2d 14, 19 (D.D.C. 2010).  The countervailing public interests, meanwhile, are close to nil.  The only public interest that carries weight is "the citizens' right to be informed about what their Government is up to."  Davis v. U.S. Dep't of Just., 968 F.2d 1276, 1282 (D.C. Cir. 1992) (citation and quotation marks omitted).  The closest Guarascio comes to showing any public interest is speculation of prosecutorial misconduct.  See Opp'n at 14.  But he failed to "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  Blackwell v. FBI, 646 F.3d 37, 41 (D.C. Cir. 2011) (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 174 (2004)).

With such a lopsided balance of interests, the Court concludes that the Bureau properly invoked Exemptions 6 and 7(C) to justify the limited redactions of names, contact information, and other personal identifiers from its production of documents.[3]

       4.   *Exemption 7(D)*

The Bureau's most expansive withholdings are those under Exemption 7(D), which shields "information compiled for law enforcement purposes" if its release "could reasonably be expected to disclose the identity of a confidential source" or could disclose "information furnished by a confidential source" during a criminal investigation.  5 U.S.C. § 552(b)(7)(D). Confidential sources can include "a State, local, or foreign agency," id., including cooperating law enforcement agencies, see Putnam v. U.S. Dep't of Just., 873 F. Supp. 705, 717 (D.D.C. 1995).  But there is "no general presumption that a source is confidential within the meaning of Exemption 7(D) whenever a source provides information to a law enforcement agency in the course of a criminal investigation."  Richardson v. U.S. Dep't of Just., 730 F. Supp. 2d 225, 237 (D.D.C. 2010) (cleaned up).  To prove a confidential relationship, an agency must do more than speak "in boilerplate terms" about the general importance of keeping documents obtained from other agencies confidential.  Raulerson v. Ashcroft, 271 F. Supp. 2d 17, 28 (D.D.C. 2002).  An agency instead "must establish a source's confidentiality on a case-by-case basis, either by showing that the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"  Shapiro v. CIA, 247 F. Supp. 3d 53, 67 (D.D.C. 2017) (quoting Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir.

---

[3] Guarascio is once more mistaken when claiming that these withholdings are overbroad. Opp'n at 13.  The FBI did not invoke Exemptions 6 and 7(C) for blunderbuss withholdings of entire documents; rather, it redacted only morsels of sensitive information under this exemption. See Seidel Decl. ¶¶ 40–50; Vaughn Index.

1995) (per curiam)).  In evaluating assurances of confidentiality in cases involving documents provided to the FBI and other law enforcement agencies, courts often look at factors such as: (1) whether the documents are "accessible to the public absent authorization from the state law enforcement agency," Putnam, 873 F. Supp. at 717; (2) whether the state agency has "specifically directed that the [documents] be withheld from release," Manchester v. FBI, No. 96-cv-0137 (JAR), 2005 WL 3275802, at *8 (D.D.C. Aug. 9, 2005); and (3) the overall course of dealing applicable to a particular case, Ford v. Dep't of Just., 208 F. Supp. 3d 237, 252 (D.D.C. 2016).

Under this exemption, the FBI withheld from disclosure entire documents from the North Carolina State Bureau of Investigation ("NCSBI") which, in the FBI's telling, were provided under express assurances of confidentiality.  See Seidel Decl. ¶ 54.  Mr. Seidel explained that, while processing the records at issue, "[t]he FBI located numerous investigative records provided by local law enforcement bearing markings stating the following:  'CONFIDENTIAL:  This is an official file of the North Carolina State Bureau of Investigation.  To make public or reveal the contents to an unauthorized person is a violation of the General Statutes of North Carolina.'"  Id. ¶ 55.  "Based on the presence of these markings," Mr. Seidel states that "the FBI determined the NCSBI provided this information under an expectation the FBI would hold the information in confidence."  Id.  He goes on to detail that the FBI heavily relies on assistance from local law enforcement and that the "release of the information the NCSBI provided in confidence could greatly harm the FBI's effectiveness in investigating/preventing criminal acts."  Id. ¶ 56.  As a result, it appears the FBI withheld in full each document sourced from the NCSBI—apparently inferring from the presence of this stamp on *some* documents a universal expectation that the

22

NCSBI intended *all* documents to remain confidential.  <u>See</u> <u>id.</u> ¶ 55.  Here, the FBI may stretch Exemption 7(D) too far.

The Bureau is certainly justified in withholding documents that have been stamped with an express "CONFIDENTIAL" label.  For example, the court in <u>Cucci v. DEA</u>, 871 F. Supp. 508 (D.D.C. 1994), found that the agency's withholdings under Exemption 7(D) were proper where the agency's declaration stated that the Virginia State Police "normally only provide[d] records with the understanding that they will remain confidential" and that "*each page* of the documents they provided expressly stated that they were confidential and not to be distributed outside the federal agency," <u>id.</u> at 513 (emphasis added).  But in this case, Mr. Seidel's declaration is silent on just how many of the withheld documents bear a confidentiality stamp or whether any unstamped documents are contained within a larger confidential file, as it simply notes that the Bureau "located numerous investigative records" carrying such markings.  Seidel Decl. ¶ 55. The Court is thus in the dark on what percentage of the withheld documents bear this banner and whether those that are marked confidential resemble those that do not.  Nor does the declaration shed any light on whether the course of dealings here suggests that these particular statements of confidentiality should be universalized.  <u>See, e.g.</u>, <u>Raulerson</u>, 271 F. Supp. 2d at 28 (rejecting an Exemption 7(D) invocation based only on "mutual understandings," "cooperative efforts," and the like when the FBI did not explain if the withheld documents were available to the public or provided on a condition of confidentiality).

Without clearer visibility into this matter, the Court cannot determine that all Exemption 7(D) withholdings are justified at this time.  The Bureau may submit a supplemental declaration to address these concerns and bolster its case on these withholdings.

     5.  *Exemption 7(E)*

Last, the FBI has invoked Exemption 7(E) to withhold two types of information relating to its techniques and procedures:  (1) Computer Analysis Response Team ("CART") reports and data; and (2) FBI FD-515 Forms used by FBI personnel to report investigative accomplishments. See Seidel Decl. ¶¶ 60–61.  Both sets of redactions were proper.

Exemption 7(E) allows law enforcement agencies to withhold documents that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  This exemption is "written in broad and general terms."  Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009).  The "exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk."  Id.  As a result, a law enforcement agency has a "relatively low bar . . . to justify withholding" under Exemption 7(E), as it need only "demonstrate logically how the release of the requested information [may] create" a risk of circumvention.  Blackwell, 646 F.3d at 42 (citation omitted).  The Bureau clears that low threshold for its two categories of withholdings.

The Bureau first applied Exemption 7(E) to a single document implicating its CART, which "provides digital forensics, technical capabilities, and related services and support to the FBI, intelligence organizations and other law enforcement agencies."  Seidel Decl. ¶ 60; see Vaughn Index at 2.  Mr. Seidel's declaration explains that CART is integral to investigations reliant on digital evidence and that "[p]roviding detailed information about CART software,

24

equipment, techniques, procedures, and/or types of reports generated by CART during their forensic testing processes would impede the FBI's effectiveness in investigating crimes where evidence can be found on computers and other digital media."  Seidel Decl. ¶ 60.  The Bureau also claims that disclosing CART information might enable criminals to circumvent the law by adjusting their behavior to avoid scrutiny.  Id.  Based on these concerns, the FBI withheld a "Service Request Confirmation from the FBI's [CART Team], dated November 18, 2008." Vaughn Index at 2.  Courts within this District confronting comparable withholdings have held the FBI "properly relies on Exemption 7(E) to withhold non-public details about CART software, equipment, techniques, procedures and reports generated during its forensic examination of" a criminal defendant's devices.  Accurso v. FBI, No. 19-cv-2540 (CKK), 2021 WL 411152, at *8 (D.D.C. Feb. 5, 2021); see also Passmore v. Dep't of Just., 245 F. Supp. 3d 191, 204 (D.D.C. 2017).  The Court follows this general practice and finds that the FBI's reliance on Exemption 7(E) in withholding this CART document was appropriate.

The Bureau also invoked Exemption 7(E) to withhold certain information contained in FD-515 forms, which FBI personnel commonly use to report investigative accomplishments and submit at various stages of investigations to report statistically important events such as arrests, convictions, sentencings, and asset seizures.  Seidel Decl. ¶ 61.  Specifically, the Bureau asserted Exemption 7(E) to shield numerical "effectiveness ratings," ranging from 1 to 4, which FD-515 forms instruct FBI personnel to assign to the various investigative techniques they used.  Id. Here, the FBI explains that it deleted these rating columns so that prospective criminals could not change their methods and modus operandi to circumvent detection.  Id.  Once again, many courts within this District rightly have upheld the redaction of "effectiveness ratings" columns, see, e.g.,

Boehm v. FBI, 948 F. Supp. 2d 9, 35 (D.D.C. 2013); Concepcion v. FBI, 606 F. Supp. 2d 14, 43 (D.D.C. 2009), and this Court sees no good reason to deviate in this case.

Guarascio's counterarguments are unconvincing.  He brags that he is "well versed" in law enforcement techniques, but that is irrelevant to whether publicizing this information could create a risk of circumvention of the law by others.  Opp'n at 15.  He also ventures a guess that the FBI might covertly be relying on his plea agreement waiver because, in "ordinary cases," it turns over "all forensic reports regarding any and all seized electronic devices."  Id. at 15.  But once again, the Court lacks license to traffic in such speculation.  Guarascio also reups his argument that the age of his criminal conviction matters here because law enforcement tactics may have changed in the interim.  Id. at 16.  Such conjecture is again unsupported and does not change the legal analysis.

The Court accordingly concludes that the Bureau has sufficiently justified all redactions, except for the withholdings under Exemption 7(D).  On the Exemption 7(D) withholdings, the Court will defer judgment until it receives the FBI's supplemental declaration and Guarascio's response.

E.  Segregability

Guarascio also argues that the FBI failed to justify its segregability determinations.  As noted above, an agency is required to produce "[a]ny reasonably segregable" information from an otherwise exempt record.  5 U.S.C. § 552(b).  An agency can carry its segregability burden on summary judgment by submitting a "comprehensive Vaughn index" coupled with an attestation that it "conducted a line-by-line review of each document withheld in full and determined that no documents contained releasable information which could be reasonably segregated from the nonreleaseable portions."  Johnson v. EOUSA, 310 F.3d 771, 776 (D.C. Cir. 2002) (cleaned up).

The FBI has done exactly that here.  The Bureau submitted a <u>Vaughn</u> index, and Mr. Seidel's

declaration explains that after "an extensive page-by-page, line-by-line review of the documents

at issue, the FBI has determined that there is no further non-exempt information that can be

reasonably segregated and released without revealing exempt information."  Seidel Decl. ¶ 63;

<u>see also</u> <u>id.</u> ¶ 62(c) (stating with respect to withholdings in full that the FBI "determined all

information on each page was covered by one or more of the cited FOIA exemptions").  This is

sufficient to satisfy the Bureau's burden on segregability, <u>see, e.g.</u>, <u>Loving v. Dep't of Def.</u>, 550

F.3d 32, 41 (D.C. Cir. 2008), and Guarascio does not flip the script with his unsupported

assertions that the FBI "arbitrarily appl[ied] redactions improperly to withhold information."

Opp'n at 16.

### IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [Dkt. No. 42] the Bureau's Motion for Summary Judgment is

GRANTED in part; and it is further

**ORDERED** that the Bureau shall, by December 15, 2023, submit a supplemental

declaration addressing the issues on which the Court reserved judgment; and that by January 15,

2024, Guarascio shall file any response to the Bureau's declaration.  The response shall address

only the reserved issues and shall not attempt to relitigate matters decided in this opinion.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>November 1, 2023</u>